# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-3465

_____

Jacobi P. Malone

*Plaintiff - Appellant*

v.

Robert Hinman, Individually and in his official capacities; City of Little Rock, a
municipal corporation and public body corporate and politic; Stuart Thomas,
individually and in his official capacity as Chief of Police, Little Rock Department

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 20, 2016
Filed: February 7, 2017

_____

Before RILEY, Chief Judge, MURPHY and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Jacobi P. Malone appeals the district court's[1] grant of summary judgment to Little Rock Police Officer Robert Hinman, Little Rock Police Chief Stuart Thomas, and the City of Little Rock (collectively, "defendants") on Malone's various constitutional claims under 42 U.S.C. § 1983 for Officer Hinman's alleged use of excessive force in shooting Malone. Viewing the facts in the light most favorable to Malone and evaluating the reasonableness of Officer Hinman's actions "from the perspective of a reasonable officer on the scene," *Graham v. Connor*, 490 U.S. 386, 396 (1989), we conclude that Officer Hinman is entitled to qualified immunity. Accordingly, we affirm the district court's grant of summary judgment to Officer Hinman, Chief Thomas, and the City of Little Rock.

## I. *Background*

We recite the facts in the light most favorable to Malone as the non-moving party. *See id*. at 388.

At approximately 2:00 a.m. on the morning of July 16, 2011, Jacobi Malone, then 18 years old, was walking back to his car parked in the Rivermarket area of downtown Little Rock, Arkansas. Malone approached a crowd of 40 or 50 people near his parked car. In the crowd, Malone saw a former schoolmate in the midst of an escalating disturbance. Malone's former schoolmate pulled out a pistol and pointed it at the crowd. Malone tried to "defuse the situation." He approached the young man with the "intention" to "push the gun down towards the ground," but, unfortunately, the gun discharged. When the gun discharged the first time, Malone's hand was on the young man's arm. The gun then discharged "one or two more times" before Malone "snatched" the gun from the young man. Hearing the gunshots, the crowd scattered. Malone started running, too, with the pistol now in his hand.

---

[1]The Honorable D.P. Marshall Jr., United States District Judge for the Eastern District of Arkansas.

Meanwhile, Officer Hinman patrolled downtown Little Rock on his bicycle when he "heard what sounded like a disturbance and saw a large group of approximately forty to fifty people in the parking lot and on the sidewalk in front of the parking lot in the 200 block of East Markham." As Officer Hinman approached the crowd on his bike, he "heard one gunshot fired." Officer Hinman observed that once the first shot was fired, the crowd dispersed in all directions. He subsequently observed Malone fleeing on foot while holding the gun.

Officer Hinman says that he yelled "stop" to Malone but that Malone continued to run. Malone, however, did not hear anyone yell at him to "stop." Malone was experiencing "an adrenaline rush," and he did not "hear anything." Officer Hinman "knew that [Malone] was running toward where Officer [Steve] Montgomery and several other individuals were located." Officer Hinman drew his weapon and fired multiple rounds at Malone, striking Malone in the arm, back, leg, and neck. The bullet that hit Malone in the neck paralyzed him from the chest down. When Officer Hinman fired his gun, Malone was two to three feet from Officer Montgomery.

Officer Montgomery and Officer Wade Neihouse, who were present at the time of the shooting, testified that three to five seconds elapsed between the first shot and shots fired by Officer Hinman at Malone. Officer Hinman estimated that "ten seconds elapsed from the time [he] heard the first shot until the time [he] fired [his] service weapon as Mr. Malone was fleeing."

Malone filed suit against the defendants for violations of his federal and state constitutional rights. He sought relief pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; the Arkansas Constitution; and the common-law tort of assault and battery. Specifically, he alleged excessive force in violation of the Fourth Amendment against Officer Hinman; maintenance of a widespread custom of permitting excessive force against

Chief Thomas and the City of Little Rock; and assault and battery against Officer Hinman. The defendants moved for summary judgment.

The district court granted the defendants' motion. The district court found that Officer Hinman was entitled to qualified immunity on Malone's constitutional claims because Officer Hinman's actions were objectively reasonable under the circumstances. The court cited the short period of time that elapsed—less than ten seconds—between when Officer Hinman heard the gunfire and when he shot Malone. The court emphasized that while Malone was running away from Officer Hinman at the time that Officer Hinman shot him, Malone was running toward Officer Montgomery. The court also noted the crowd's presence when the shots were fired and that Malone held a gun as he ran. Although the court found it "disconcerting" that Officer Hinman had given inconsistent testimony about whether Malone turned to fire at him and found it "unclear" whether Officer Hinman saw Malone shoot into the crowd, it concluded that such details did not "change the constitutional analysis because no genuine issues of *material* fact exist." The court also determined that Malone's claims against Chief Thomas and the City of Little Rock failed for lack of evidence because Malone did not rebut Chief Thomas's testimony that Officer Hinman was trained properly and that excessive-force incidents are properly investigated and handled. The court dismissed Malone's state-law claim without prejudice and dismissed the federal claims with prejudice.

II. *Discussion*

On appeal, Malone argues that the district court erred in (1) granting summary judgment based on qualified immunity to Officer Hinman on Malone's excessive-force claim, and (2) granting summary judgment to Chief Thomas and the City of Little Rock on Malone's claim of a widespread custom of excessive force.

-4-

A. *Excessive Force*

Malone argues that the district court erred in granting Officer Hinman's motion for summary judgment based on qualified immunity on Malone's excessive-force claim.

We apply de novo review to the district court's grant of summary judgment to the defendants, "viewing the evidence in the light most favorable to [Malone] and drawing all reasonable inferences in [his] favor." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). A district court appropriately grants summary judgment to the movant "if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)). "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Id*.

"Since this case presents an issue of whether an officer used excessive force, the case must be analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005) (quoting *Graham*, 490 U.S. at 388). The standard that we apply in deadly force cases is well settled:

> The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. [*Graham*, 490 U.S. at] 397, 109 S. Ct. 1865. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. *Id*. at 396, 109 S. Ct. 1865. The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. *See Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed.2d 1 (1985). We judge the reasonableness of [an officer's] use

of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865.

*Loch*, 689 F.3d at 965.

If a "suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11. But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id*. "Before employing deadly force, an officer should give 'some warning' when it is 'feasible' to do so." *Loch*, 689 F.3d at 967 (quoting *Garner*, 471 U.S. at 11–12).

"Once the predicate facts are established, the reasonableness of [an officer's] conduct under the circumstances is a question of law." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001). But Malone contends that factual disputes exist about the predicate facts that prelude a grant of summary judgment on Malone's excessive-force claim in Officer Hinman's favor. Malone asserts that a factual dispute exists as to whether Officer Hinman knew that someone had been injured when Officer Hinman shot Malone. Therefore, Malone argues, the court could not consider Officer Hinman's purported knowledge in determining whether Officer Hinman had probable cause to believe that Malone posed a threat to Officer Hinman or others. He also claims that factual disputes exist as to whether Officer Hinman observed Malone shooting when the shots were fired into the crowd and whether Malone ever turned toward Officer Hinman. Malone asserts that these fact disputes preclude a reasonable conclusion that Malone threatened Officer Hinman or others.

Officer Hinman stated in his affidavit that after he initially heard shots fired, he observed "Malone, holding a weapon, . . . fire approximately two more shots into the crowd." Malone recalled and testified similarly that the gun discharged two to three times while he wrestled the gun from his friend. Malone also admitted that he took possession of the gun and had it in his hand as he fled. Officer Hinman testified that he observed Malone holding the gun when it fired. In contrast, Malone testified that he had not acquired possession when the gun fired because he was simply pushing the young man's arm down to avoid injury to others. Like the district court, we conclude that these differing viewpoints do not change our constitutional analysis. The crucial common fact in both accounts is Malone's eventual possession of the weapon at the time that Officer Hinman fired. The differences in the factual statements are thus not *material*. In his brief, Malone admits that "[a]s [he] was trying to get the gun, the gun discharged" and that when he was "able to get his hand on the gun . . . it went off again once, maybe twice." This is consistent with Officer Hinman's testimony about hearing gun shots fired. Malone has pointed to no record evidence to refute Officer Hinman's testimony that he heard shots fired or that he observed Malone fleeing with the gun after the shots were fired. In fact, Malone testified that when people scattered following the gunshots, he had "possession of the gun" and his "intentions were to run and . . . get rid of the weapon, so [he] ran back west, up the sidewalk" with the gun. As the district court summarized, the material, "undisputed facts according to Malone are these: around 2:00 a.m. he had a pistol in his hand after shots had been fired in a crowd at the Rivermarket; and he was fleeing the scene toward other people nearby."[2]

---

[2]To support his argument that the district court erred in finding that Officer Hinman's actions did not constitute excessive force, Malone also points to the report of Sergeant Calvin K. Grogan. Sergeant Grogan arrived at the scene shortly after the incident occurred. Sergeant Grogan wrote, "Officer Hinman said he confronted the man and that the man in quotations 'tried to get his gun out,' end quotations." Malone argues that the district court erred in finding Officer Hinman's actions objectively reasonable because Officer Hinman's statement to Sergeant Grogan that Malone

Based on these undisputed facts, the relevant question is whether Officer Hinman's use of deadly force against Malone was objectively reasonable under the circumstances. *See Loch*, 689 F.3d at 965. More specifically, the question is whether Officer Hinman had "probable cause to believe that [Malone] pose[d] a threat of serious physical harm to the officer *or others*." *See id.* (emphasis added). Viewing the facts in the light most favorable to Malone, he did not pose a threat of serious physical harm to Officer Hinman because he was running away from Officer Hinman. But we conclude that, looking at the circumstances from the perspective of a reasonable officer and taking the disputed facts in Malone's favor, Malone posed a threat of serious physical harm to *others*. Officer Hinman knew that approximately three gunshots had just been fired in a crowd of 40 to 50 people. He then saw Malone running away with a gun toward Officer Montgomery and others as the crowd dispersed. Officer Hinman instructed Malone to stop, but Malone did not stop because he did not hear Officer Hinman.[3] Malone continued to run toward Officer

_____

"tried to get his gun out" was a lie. But the dispute over whether Officer Hinman told Sergeant Grogan that Malone tried to get his gun out is not material to Officer Hinman's entitlement to qualified immunity. As explained *supra*, we have construed the facts in the light most favorable to Malone and accepted his version of events. We evaluate Officer Hinman's actions in reacting to these circumstances "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

[3]No genuine issue of material fact exists as to whether Officer Hinman provided Malone with a warning prior to using deadly force. Officer Hinman testified that he yelled "stop" to Malone but that Malone continued to run. Malone testified that he did not hear anyone yell "stop" to him. Malone was experiencing "an adrenaline rush," and he did not "hear anything." Malone "did not testify that warnings were not given but only that he did not hear any warnings"; as a result, his testimony "fails to contradict the officer's positive testimony that he warned [Malone] . . . before firing a shot. Consequently, [Malone's] testimony that he did not *hear* any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given." *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988). Nor does Malone's reliance on the testimony of Tunisha Johnson generate a disputed issue of fact. She testified only to what she *saw*,

Montgomery. The record shows that Malone was two to three feet from Officer Montgomery at the time that Officer Hinman fired his gun. The entire event occurred within three to ten seconds.

Like the district court, we recognize the tragic nature of these events: "Taking Malone's version as the truth, his good deed in defusing a dangerous argument, coupled with two split-second decisions, resulted in a promising young man's paralysis." Nonetheless, applying the required review standard, we hold that Officer Hinman's use of deadly force was objectively reasonable. Therefore, the district court did not err in granting Officer Hinman's motion for summary judgment based on qualified immunity on Malone's excessive-force claim.

### B. *Widespread Custom of Excessive Force*

Malone argues that the district court erred in granting summary judgment to Chief Thomas and the City of Little Rock on his claim of a widespread custom of excessive force. According to Malone, "[i]gnoring or concealing police misconduct, and the inadequate investigation of excessive force, as well as failures to discipline, supervise or monitor police officers for misconduct, are all actionable theories of *Monell*[4] liability." (Italics omitted.) Malone contends that Chief Thomas knew that the Little Rock Police Department altered evidence to fit Officer Hinman's story. He also contends that he offered evidence to contradict Chief Thomas's statement. He asserts that the district court excluded such evidence because Malone failed to provide it prior to the discovery cut-off deadlines. Malone asserts that the district court's exclusion of this evidence was erroneous because it impeached Chief Thomas's testimony.

---

not to what she *heard*. She testified, "I seen, I guess it was the officer running and the police officer just shot him." She never discussed whether warnings were given prior to Officer Hinman shooting Malone.

[4]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), (2) an unofficial "custom," *id.*; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). Policy and custom are not the same thing. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

*Corwin v. City of Indep., Mo.*, 829 F.3d 695, 699–700 (8th Cir. 2016) (alteration in original) (footnote omitted).

Because we conclude that Officer Hinman did not violate Malone's constitutional rights, there can be no § 1983 or *Monell* liability on the part of Chief Thomas and the City. *See, e.g.*, *Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Sitzes v. City of W. Memphis Ark.*, 606 F.3d 461, 470 (8th Cir. 2010) (agreeing with district court that plaintiffs' failure to train and failure to supervise claims "could not be sustained absent an underlying constitutional violation by the officer"); *Sanders v. City of Minneapolis, Minn.*, 474

F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* . . . municipal liability.").[5]

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

———————————————

[5]Malone also argues that the district court erred in granting the defendants' motion to strike certain exhibits attached to Malone's response to the defendants' motion for summary judgment because they were offered after the discovery deadline expired. The district court's exclusion of this evidence relates to Malone's *Monell* claim against Chief Thomas and the City. We need not reach this issue because Malone failed to establish an underlying constitutional violation to support his *Monell* claim.